**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,**

v.

**JORDAN GRAPHICS, INC., Defendant.**

**No. C–C–89–137–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 12, 1991.

See also 135 F.R.D. 126.

John H. Edmonds, Rickye McKoy–Mitchell, Humphrey S. Cummings and Julie H. Foshbinder, E.E.O.C., Charlotte Dist. Office, Charlotte, N.C., for plaintiff.

David L. Terry, Richard F. Kane, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, District Judge.

THIS MATTER was tried before the undersigned from May 14, 1991 through May 17, 1991 without a jury in Charlotte, North Carolina. The complaint alleges that Defendant engaged in unlawful employment practices at its Mecklenburg County, North Carolina facility by failing to hire Claimant Andria Tribble and other blacks on account of their race. *See Plaintiff's Complaint*, filed March 21, 1991, at par. 7. Plaintiff was represented at trial by John H. Edmonds, Rickye McKoy–Mitchell, Humphrey S. Cummings, and Julie H. Foshbinder, all from the Charlotte Regional Office of the Equal Employment Opportunity Commission. Defendant was represented at trial by Richard F. Kane and David L. Terry, both from the Charlotte law firm of Blakeney, Alexander & Machen.

Following the close of Plaintiff's evidence, Defendant moved for a directed verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court deferred ruling on the motion. After Defendant had presented its evidence, Defendant renewed its motion. The Court once again deferred ruling on the motion. Based on the Order of the Court herein, the Court now believes Defendant's motion for a directed verdict is moot, and should therefore be dismissed as such.

Having heard the witnesses, weighed the evidence, and considered the arguments made by counsel, the Court enters the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT.

### A. *Jurisdictional Requirements.*

(1) This Court has jurisdiction of this case pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. The action is brought pursuant to Section 706(f)(1) of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e–5(f). That statute authorizes Plaintiff to bring actions on behalf of persons that have been subjected to employment discrimination based on their race.

(2) Plaintiff is the agency of the Government of the United States which is statutorily charged with the duty to administer, interpret and enforce Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*

(3) Defendant is in the business of producing business forms and other graphic

materials. Plaintiff's Trial Exhibit 9.[1] It maintains a facility on the western edge of Mecklenburg County, bordering Gaston County. Trial Testimony of Catherine Thompson at 186 [2]; Defendant's Ex. 30. At all times relevant to this litigation, Defendant employed in excess of 15 employees and is an "employer" as defined by § 701(b) of Title VII, 42 U.S.C. § 2000e(b). Plaintiff's Ex. 9 at par. 3.

(4) The subject matter of this action resulted in a charge of discrimination that was timely filed by Claimant Andria Tribble on August 18, 1986. Plaintiff's Ex. 1. Claimant Tribble alleged in that charge that she was denied employment opportunities with Defendant because of her race. *Id.* Moreover, Claimant Tribble alleged that Defendant was discriminating against blacks as a class.

(5) Thereafter, Plaintiff began an investigation of the charge. Plaintiff's Ex. 2, 17, and 154–157. The investigation resulted in a letter of determination being issued on January 22, 1988. Plaintiff's Ex. 3. That letter states that Plaintiff believed reasonable cause existed to conclude that Claimant Tribble's race was a factor in Defendant's failure to hire. *Id.* at 2. The letter further states that Defendant's practice of utilizing word-of-mouth advertising to fill job vacancies had an adverse impact on blacks as a class. *Id.* at 3. Finally, the letter invited Defendant to enter into discussion with Plaintiff to bring about a just resolution of the matter. *Id.* at 4.

(6) A conciliation agreement was prepared by Plaintiff and submitted to Defendant. Defendant's Ex. 23. The proposed conciliation agreement provided that Defendant was to eliminate word-of-mouth advertising and advertise all vacant jobs in the *Charlotte Observer, Charlotte Post,* and *Gastonia Gazette. Id.* at 4. Moreover, the agreement required Defendant to offer Claimant Tribble a position and back pay. *Id.* at 3. As to the class of blacks, the agreement required Defendant to offer three additional Claimants positions and back pay. *Id.* at 4.

(7) Defendant has claimed that Plaintiff failed to offer to conciliate regarding the class of blacks that were allegedly subjected to disparate treatment. However, nowhere in the agreement is it stated that the three (3) additional Claimants are the only members of the affected class.

(8) Plaintiff was only required to provide Defendant with reasonable notice of the general type of discrimination alleged and to provide Defendant with an opportunity to remedy the problems out of court. *See EEOC v. American National Bank,* 652 F.2d 1176, 1186 (4th Cir.), *rehearing denied,* 680 F.2d 965 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). The emphasis of the conciliation provision of Title VII is not to provide a rigid pleading requirement on the EEOC in enunciating the reasonable cause determination, but instead to provide employers with the opportunity to resolve disputes with the EEOC before a lawsuit is filed. *See EEOC v. General Electric Company,* 532 F.2d 359, 371 (4th Cir.1976) ("[A]s a practical matter, it would seem the defendant was thus given by the EEOC its right of comment and merely because it came during conciliation rather than before the reasonable cause determination would appear immaterial"). It is immaterial that the EEOC did not specifically state in the determination letter all of the alleged discriminatory practices and all of the class members. *See EEOC v. Reichhold Chemicals, Inc.,* 700 F.Supp. 524, 527 (N.D.Fla. 1988) (finding that where EEOC in course of investigating a charge of discrimination develops facts which lead it to believe that a separate, uncharged incident or form of discrimination has occurred may attempt to conciliate the finding of the uncharged discrimination, and if conciliation fails, suit may be filed). What is material is whether Defendant was provided with an opportunity to conciliate. *See EEOC v. Sears, Roebuck and Co.,* 650 F.2d 14, 19 (2d Cir.1981).

---

**1.** Exhibits from the trial will hereinafter be referred to as "Plaintiff's Ex. ——" or "Defendant's Ex. ——".

**2.** Trial testimony of witnesses and the corresponding page of the trial transcript will hereinafter be referred to as "(witness) Tr. at (page number)".

The Court finds as a matter of fact that Plaintiff provided Defendant an opportunity to conciliate. Defendant was aware of the uncharged discriminatory practices and class members alleged by Plaintiff. Moreover, Plaintiff was willing to meet and discuss conciliation regarding these practices and class members with Defendant. Defendant, however, was not amenable to conciliation. Plaintiff's Ex. 4. Therefore, the Court finds that Plaintiff complied with the requirement that it "... [e]ndeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation and persuasion". *See* 42 U.S.C. § 2000e–5(b).

(9) All conditions precedent to the institution of this lawsuit have thus been fulfilled.

B. *Scope of the Action.*

(10) The relevant class period of this action is February 18, 1986 through May 9, 1989. Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 15 on page 4; Defendant's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 2 on page 8.

(11) The class members are those persons that applied for entry level positions during the relevant class period. Through running advertisements in local newspapers, Plaintiff initially identified approximately 50 possible class members. After review of the claims of these persons, Plaintiff reduced the applicable class to 24 members. Defendant's Ex. 48. Before the trial of this matter, Plaintiff failed to timely respond to Defendant's Second Requests for Admissions. *See Order of this Court*, filed March 8, 1991, at 6 (deeming admitted Defendant's Second Requests for Admissions).[3] The effect of these admissions was to reduce the class to only 14 members. On the eve of trial, Plaintiff reduced

---

**3.** Throughout the pendency of this case, Plaintiff consistently refused to comply with discovery orders and the pretrial order.

On January 16, 1990, the Court entered an Order directing Plaintiff to respond to Defendant's interrogatory seeking the names of the class. The Court stated:
> ... [t]he Court is perplexed by Plaintiff's obstinateness in refusing to provide this information for Defendant. Plaintiff's only excuse for refusing to provide this information is that it has not completed its investigation and interviews with the persons who responded to its advertisement. However, the Court notes that this action was filed by Plaintiff on March 21, 1989. The discovery period was enlarged twice in response to Plaintiff's motions. It is inconceivable to the Court that Plaintiff would file this action over nine months ago and still be unable to provide Defendant with the necessary information needed by Defendant to proceed with this matter. The Court will not permit Plaintiff to bottleneck the disposition of this matter because it has failed to do what should have been done long ago....

On January 28, 1990, the Court entered an Order in response to Plaintiff's motion to enlarge the discovery period. The Court stated:
> The Court's review of the case file reveals Plaintiff's repeated attempts throughout litigation to blame bureaucratic procedures and personnel shortages for delays in discovery. The Court no longer will tolerate such excuses. The Court's personnel is limited in number, yet the Court attempts to move cases

swiftly and efficiently through the judicial system in this District. The undersigned and his personnel have spent many an evening and many a weekend working long hours trying to prepare some of the hundreds of pending cases for placement on the trial calendar. The Court believes that justice which is not swift may not be justice at all.

On December 4, 1990, the Court entered an Order directing Plaintiff to produce a report from its expert. The Court stated:
> The record in this case indicates Plaintiff has been dilatory on other occasions in responding to discovery requests. The Court believes that the failure of Plaintiff to have the expert's final report prepared at this point demonstrates either poor planning or an attempt to ambush Defendant right before trial. In any event, the Court loathes being dragged into discovery disputes because Plaintiff has chosen to engage in slothful or unethical behavior. The Court is placing Plaintiff on notice that its patience is wearing thin in regard to delays in discovery being produced by Plaintiff.

On March 8, 1991, the Court entered an Order deeming admitted Defendant's requests for admission based on Plaintiff failing to file responses in a timely manner. The Court stated:
> Throughout the duration of this litigation, Plaintiff has demonstrated a contemptible arrogance concerning its obligations to comply with the rules of discovery. The record in this case indicates Plaintiff has been dilatory on other occasions in responding to discovery requests.... In this instance, the Court believes that Plaintiff failed to respond to the

the class to 9 members. *See* Plaintiff's Trial Brief, filed May 7, 1991 at Attachment A. At the trial of this matter, only 6 of the class members appeared and presented testimony. *See generally* Trial Tr. at 18–176. A seventh class member was hospitalized during the trial. The Court found her to be an unavailable witness and admitted her deposition testimony in lieu of live testimony. Trial Tr. at 665–666.

For these reasons, the Court finds that evidence of seven (7) class members was presented at trial. Those persons are as follows: Andria Marie Tribble, Janet Lynn McCorkle, James Howard Allen, Jerry Burch, Patricia Ann Gillespie, Troy Damon Darby, and Johnny Xavier Fewell.

(12) It is undisputed that during the relevant class period, Defendant filled 77 vacant entry level positions. Defendant's Ex. 52. Of the 77 persons hired for these positions, 9 hirees were black. *Id.*

(13) This action is limited to alleged discrimination in Defendant filling entry level positions. The following positions were the only entry level positions at Defendant's facility during the class period. The number of persons hired for the positions is also provided: assistant truck driver (2); material handler (14); warehouse helper (4); jogger/bindery (10); janitor (6); baler operator (4); label inspector (19); knife operator (1); press trainee (1); bindery (1); collator helper (2); press jogger (10); and general bindery (3). Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at 4–5; Defendant's Ex. 49 and 50.

### C. *The Hiring Process.*

(14) During the relevant class period, approximately 600 persons applied at Defendant's facility for entry level positions. Trial Tr. at 216–217; Plaintiff's Ex. 152.

(15) All of the personnel and management responsible for hiring at Defendant's facility were white. Channon Tr. at 330–335; Coe Tr. at 227–228.

(16) An applicant for an entry level position at Defendant's facility would apply at a window in the foyer of the Personnel Office. The applicant would receive an application from the Personnel Assistant. The application was completed there and returned to the Personnel Assistant. The Personnel Assistant, Cynthia Ross and later Barbara Blanton, would then forward the applications to the Personnel Manager, Stephen Coe. Coe Tr. at 235–236.

(17) Coe became the Personnel Manager at Defendant's facility in May, 1986. *Id.* at 227. Prior to Coe, Cathy Stewart was the Personnel Manager at Defendant's facility. Hiring procedures, however, during the relevant class period were for the most part the same during the tenures of both managers. *Id.* at 238–239; Plaintiff's Ex. 153.

(18) Coe, with extremely rare exceptions, was not aware of the race of an applicant

requests in a timely fashion either because of poor planning or because of gross indifference to the time requirements clearly enunciated in the Federal Rules of Civil Procedure. In either event, the Court will not endorse Plaintiff's behavior. The time has come for Plaintiff to realize that the Court will not tolerate Plaintiff's refusal to comply with the rules of discovery. The Court will not grant Plaintiff's alternative request for relief that withdrawal or amendment of the requests be permitted. The Court believes to grant such relief would reward Plaintiff's conduct.... Defendant has requested that the Court award its costs in responding to Plaintiff's motion. Because the Court believes Plaintiff's conduct in failing to respond to the requests in a timely fashion was inexcusable, the Court will grant Defendant's request.

On May 9, 1991, the Court entered an Order in response to Defendant's motion for Plaintiff to show cause why it should not be held in contempt for failing to pay attorney's fees as directed by the Court in the above cited Order of March 8, 1991. The Court stated:

On March 8, 1991, this Court entered an Order whereby Plaintiff was directed to pay $1,137.00 in attorney's fees incurred by Defendant. The Court directed Plaintiff to tender the payment to Defendant within thirty (30) days of the entrance of the Order. When Defendant filed its motion on May 3, 1991, 46 days had passed from the Court entering the Order. Yet, Plaintiff had failed to comply with the Order. Furthermore, Plaintiff had failed to inform the Court that it was unable to comply with the Order, or that it would be delayed in doing so. On May 8, 1991, the Court received from Defendant a letter indicating that some 21 days late, Plaintiff had finally complied with the simple direction of the Court.

when the application was submitted. *Id.* Neither Ross nor Blanton told Coe the race of an applicant. *Id.* at 236, 237, and 291; *see also* Blanton Tr. at 322. The application had no race indicator on it, nor did the Personnel Assistant record the race of the applicant on the application. Plaintiff's Ex. 32–125, 138, and 152. Only once or twice during the class period when Ross or Blanton stepped away from their desks did Coe take an application directly from an applicant. Coe Tr. at 237. Coe's office was not in view of anywhere where an applicant would be. *Id.* at 292.

(19) Coe did not learn the race of the class members until after Plaintiff submitted the conciliation agreement. *Id.* at 293.

(20) The Court believes that Coe and Blanton were credible witnesses. Based on the unrefuted testimony of Coe and Blanton, the Court finds that Coe did not know the race of an applicant when the applicant applied for a position at Defendant's facility.

(21) Between May 1986 through October 1986, Defendant had an open application period. Any person coming into Defendant's facility during this time period could submit an application as long as that person had not submitted a previous application within the previous 30 days. *Id.* at 233. Applications during this time period were kept active more than 30 days, however. No hard and fast rule was used by Coe to determine whether an application would be placed in the inactive file. *Id.* at 234.

(22) Plaintiff, at trial, claimed that Defendant engaged in an illegal employment practice by refusing to hire black applicants with applications 30 days or more old. Trial Tr. at 719–720; Plaintiff's Ex. 158. In fact, during the entire time period Coe was Personnel Manager, he did not restrain or restrict hiring from applications that were 30 days or more old. Coe Tr. at 309. The Court believes the evidence at trial indicates that the 30 day period only restricted applicants from submitting an application within that time period when a previous application was already on file.

The 30 day period did not restrict Coe from considering applications that were more than 30 days old.

Even if Plaintiff's argument that the 30 day rule was a discriminatory practice was convincing, the practice can hardly be characterized as discriminatory. From Plaintiff's own exhibit, three (3) black applicants were hired more than 30 days after submitting their applications. Plaintiff's Ex. 158. Thus, the practice was consistent for black as well as white applicants.

(23) After October, 1986, applications were maintained in job files. Coe Tr. at 234. The application form had a place for the applicant to indicate for which position he or she was applying. Plaintiff's Ex. 32–125, 138, and 152. When Coe received the applications from the Personnel Assistant, he would evaluate the job the applicant was interested in and place the application in a file for that particular job. *Id.* Occasionally, Coe would place the application in an alternative job file if he believed the applicant's qualifications were better suited for another job. *Id.* at 295. On some occasions, Coe or a supervisor would remember the application of a person that had previously applied for a filled position and place that application in a job file different than the job noted on the application. *Id.*

(24) Despite occasional incidents out of the norm, Defendant usually filled positions with persons that indicated on their application that they were applying for that particular position. At trial, Plaintiff introduced an exhibit that indicated 18 of the 77 persons hired during the relevant class period were hired for positions other than what they had applied. Plaintiff's Ex. 157. According to Plaintiff, the exhibit demonstrates that Defendant engaged in a discriminatory employment practice by hiring white persons for positions other than those noted on the application while restricting blacks to only those positions that they stated they were interested in. The exhibit, however, is inaccurate.

(a) The first six (6) applicants listed on the exhibit applied for positions prior to Defendant implementing the job file system. Therefore, these applicants were not

placed in a job file and were considered under the open application system. Coe Tr. at 271.

(b) Will Parnell applied for a shipping/receiving position. He was hired as a material handler. The positions are the same. Thus, this position was the same position for which he applied. *Id.* at 302.

(c) Bryan Jett applied for a shipping/receiving/machinist position. He was hired as a material handler. The positions are the same. Thus, this position is the same position for which he applied. *Id.* at 303.

(d) Sylvia Wentz applied for a warehouse position and was hired as a material handler. Persons that perform the job of material handler do so in the warehouse. *Id.* at 302–303. Therefore, these positions are the same.

(e) Jeffery Vernon applied for the position of warehouse jogger. He was hired as a pressroom jogger. These positions are substantially the same. *Id.*

(f) Jane Kornegay applied for the position of accounts pay clerk. She was hired for the position of label inspector. However, she actually performed clerical duties. For budget reasons, Ms. Kornegay was listed as a label inspector but did not perform those duties. From the time she was hired, Ms. Kornegay was hired to perform clerical duties and has always performed these duties. *Id.* at 273–274.

(g) Reesa Smith applied for a position as an office assistant. She was hired as a warehouse helper. However, Ms. Smith has always performed office work in the warehouse. *Id.* at 301–302.

(25) Based on the information above, only 7 of the 77 persons hired were hired for positions other than what they indicated on their application. Moreover, of the 18 persons listed on Plaintiff's Exhibit 157, 4 of those persons are black. From the face of Plaintiff's Exhibit 157, it is apparent that Defendant did not utilize this practice to discriminate against blacks. Rather, the practice was applied to both blacks and whites. For these reasons, the Court finds no merit in Plaintiff's contention that Defendant engaged in the discriminatory employment practice of hiring white applicants for positions that they did not apply for and failing to do the same for black applicants.

(26) After Coe received a sufficient number of applications for a particular vacant position, he would review those applications. *Id.* at 237.

(27) The entry level positions did not require any particular skills or expertise. Coe Tr. at 240; Travis Tr. at 324–325; Addis Tr. at 398. Some of the jobs could be learned in 45 minutes with on-the-job training. Deaton Tr. at 349.

(28) Despite the lack of particular skills for the entry level positions, Coe kept certain qualities in mind when he evaluated the applications. In particular, Coe considered whether the applicant had (1) a stable work history, (2) no obligations that would prevent him or her from working consistently, (3) no previous convictions of a felony, (4) reliable transportation, (5) previous manufacturing experience, and (6) used an excessive number of sick days at previous jobs. Coe Tr. at 236–237.

(29) Although it was considered a plus by Coe if an applicant had these and other qualities, the presence or absence of these qualities was not determinative in the final decision on whether to hire a particular applicant. *Id.* at 244 and 299. Coe compared each of the applications in the pool of applications for a given job. *Id.* at 244. If only a few persons applied for a job, Coe could not afford to ensure that the person had each of the qualities that Defendant preferred its employees have. As Coe testified, "I mean obviously stability of employment is an important factor, but they're all relative in the comparison pool". *Id.* For example, although it was preferred that an applicant for the position of baler have lift experience, if no candidates in the job file had such experience, Coe would go with the next best candidate. *Id.* at 251.

(30) Having reviewed the pool of applicants for a particular position, Coe would choose several of the best qualified applicants in the pool and forward those applications to the line supervisor. *Id.* at 236.

The supervisor would only see the applications that Coe forwarded. *Id.* at 237. The supervisor would then decide which applicants to interview, but he could interview only those applicants whose application had been forwarded by Coe. *Id.* at 239; *see also* Travis Tr. at 323. The supervisor would then notify Coe or Blanton which applicants he wished to interview, and Coe or Blanton would arrange for the applicant to come to the facility for an interview. Coe Tr. at 239. Blanton would also do a very limited verification of the employment history of the applicants chosen for an interview. *Id.* at 240.

(31) The supervisors considered generally the same qualities in applicants as did Coe when deciding which persons to hire. Travis Tr. at 323–324.

(32) Although Coe as Personnel Manager had theoretical veto power over a supervisor's selection of an applicant to fill a vacant position, Coe never exercised that power. Coe Tr. at 227. Therefore, the supervisors were the persons that decided which person would be hired for an entry level position.

(33) Just as Coe did not know the race of a particular applicant, the supervisor did not know an applicant's race when he was deciding which applicants to interview. *Id.* at 237; *see also* Travis Tr. at 327. "Not only did I not see the applicant so I had no indication of their race, then obviously the supervisors didn't. It was sort of a double-blind type situation." Coe Tr. at 237. Based on the uncontradicted testimony of Coe and Travis, the Court finds that the supervisors were unaware of the race of an applicant until that applicant came for his or her interview with the supervisor. *Id.* at 315.

(34) Only one (1) of the class members, Jerry Burch, was successful in receiving an interview with a supervisor. Burch Tr. at 124. Therefore, Burch was the only member of the class of whom Defendant's supervisors were aware of the applicant's race.

### D. *Word–of–Mouth Advertising.*

(35) Throughout the pendency of this matter, Plaintiff has insisted that Defendant relied on word-of-mouth advertising to fill vacant positions with the intent or adverse impact of excluding blacks from the hiring process. The crux of Plaintiff's argument is stated as follows: "The screening of blacks during the selection process and the lack of hiring of blacks has been the result of word-of-mouth recruitment and subjective hiring criteria implemented by all whites involved in the recruitment, screening and selection of employees at Jordan Graphics." *See* Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 41 on page 15.

(36) As the Court has discussed *supra,* none of those persons with hiring discretion knew of the race of those persons submitting applications at Defendant's facility prior to being interviewed. Only one (1) of the class members, Jerry Burch, was successful in obtaining an interview. As is discussed *infra,* the Court believes the facts indicate Defendant was justified in rejecting Burch as a suitable candidate for a position at Defendant's facility. Therefore, the Court rejects as inconsistent with the facts of this case Plaintiff's assertion that Defendant used subjective hiring criteria to screen out blacks from being hired at its facility. Thus, the only contention remaining for the Court to discuss is whether Defendant used word-of-mouth advertising to screen out blacks from the selection process.

(37) The application forms used by Defendant have a section that asks the question, "What prompted you to apply for employment at Jordan Graphics, Inc.?". Plaintiff's Ex. 32–125, 138 and 152. Under the question, the applicant may check one or more of the following boxes: company image, friend, relative, newspaper ad, or other. *Id.* Under the response to the questions are two (2) lines in which the applicant can further respond to the question. *Id.*

(38) According to Plaintiff, Defendant had a predominately white work force. Plaintiff's Ex. 6. From 1982 through 1987,

Defendant's total work force was comprised of 6 to 8 percent blacks. *Id.; see also* Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 37 on page 14. These figures represent the percentage of blacks in the entire work force—not just entry level positions.

(39) According to Plaintiff, the effect of having a box for applicants to indicate they were referred to Defendant's facility by a friend or relative was to perpetuate the predominately white work force. Plaintiff contends that the applicant "was usually of the same race as the person making the referral." Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 36 on page 13. Of the 66 whites hired by Defendant during the class period, 55 were referred by a friend or relative. *Id.* at par. 34 on page 13.

(40) Plaintiff's contentions have no basis in fact. Of the 55 white hirees that indicated that they were referred by a friend or relative, only 5 gave a name of the friend or relative that referred them. Plaintiff's Ex. 63, 64A, 78, 96, and 102; *see generally* Plaintiff's Ex. 42–125 and 138. Therefore, Coe was unaware of who was referring 50 of the hirees that checked the friend or relative boxes. Hence, Coe was also unaware of the race of the person referring those applicants. Coe Tr. at 297.

Coe had no way of knowing whether the friend or relative that was referring the applicant was an employee at Defendant's facility or if the referring person was just somebody in the community. *Id.* at 296. "As a matter of fact, sometimes if it was checked relative, you wondered if it was just their moms sending them out to get a job". *Id.*

(41) Coe and Travis testified credibly that they placed no weight on whether an applicant checked the friend or relative box. Coe Tr. at 296; Travis Tr. at 327.

(42) Plaintiff's own witnesses at trial contradicted the contention that Defendant gave preference to applicants that checked the friend or relative box.

(a) Vicki Beam was hired by Defendant in August, 1986 for an entry level position. Plaintiff's Ex. 57. Beam checked the newspaper box on the application. *Id.* Beam's brother, Tim Jones, worked at Defendant's facility when she applied. Beam Tr. at 356. However, Jones did not assist Beam in obtaining an interview at Defendant's facility. *Id.*

Based on this unrefuted testimony, the Court finds that Defendant did not favor Beam based on her brother being employed at its facility.

(b) David Addis was hired by Defendant in January, 1988 for an entry level position. Plaintiff's Ex. 46. Addis checked the relative and newspaper boxes on the application. *Id.* Addis' brother, Barry Addis, worked at Defendant's facility. D. Addis Tr. at 367. Coe knew that Addis' brother worked at Defendant' facility. *Id.* However, Addis was not permitted to submit an application because of his brother. Rather, he was required to wait until the vacancy was advertised in the newspaper. *Id.* at 376. Moreover, Addis' brother never talked to Coe or Blanton about hiring his brother. B. Addis Tr. at 402.

Based on this unrefuted testimony, the Court finds that Defendant did not favor Addis based on his brother being employed at its facility.

(c) Stacy Leatherman was hired by Defendant in April, 1986 for an entry level position. Plaintiff's Ex. 61. Leatherman's brother and mother worked at Defendant's facility. Leatherman Tr. at 380, 381 and 386. Leatherman checked the relative and newspaper box on the application. Plaintiff's Ex. 61. At trial, Leatherman testified that his mother did not tell him about an opening at Defendant's facility. Leatherman Tr. at 381 and 386.

Based on this unrefuted testimony, the Court finds that Defendant did not favor Leatherman based on his brother and mother being employed at its facility.

(d) Ryan Stroupe was hired by Defendant in May, 1987 for an entry level position. Plaintiff's Ex. 121. Stroupe checked the friend and newspaper boxes on the application. *Id.* Several of Stroupe's friends from high school worked at Defendant's facility. Stroupe Tr. at 389. How-

ever, none of Stroupe's friends suggested that Stroupe submit his application. *Id.* at 390. Instead, Stroupe had heard that Defendant was a good employer. *Id.* Moreover, Stroupe responded to a newspaper advertisement. *Id.* at 392.

Based on this unrefuted testimony, the Court finds that Defendant did not favor Stroupe based on his friends being employed at its facility.

(43) Plaintiff's contention that Defendant excluded blacks from its work force by only hiring those persons that checked the friend or relative box is refuted by the fact that 2 of the class members, Johnny Fewell and Andria Tribble, checked the friend box. Plaintiff's Ex. 36 and 40. Moreover, Fewell noted on his application that he was referred by two (2) employees of Defendant—Haskell Good and Jeff Vernon. Plaintiff's Ex. 36. Jeff Vernon is a white employee of Defendant and Haskell Good is a black employee. Fewell Tr. at 68. Furthermore, Tribble was referred to Defendant's facility by a black employee, Johnny Nichols. Tribble Tr. at 97.

(44) Plaintiff's contention that Defendant relied on word-of-mouth advertising to exclude blacks from its work force is further contradicted by the fact that Plaintiff failed to dispute that Defendant advertised 85 to 90 percent of its job openings. Coe Tr. at 269, 295, and 312. Moreover, Defendant advertised in widely circulated newspapers—the *Charlotte Observer* and the *Gaston Gazette*. *Id.* at 312.

(45) The success of the advertisements in allowing a wide range of persons learn of job vacancies is demonstrated by examining the applications of the class members. Of the 6 applications of class members introduced at trial, 4 checked the newspaper box. Plaintiff's Ex. 32, 34, 35, and 37. Moreover, most of the applicants hired by Defendant also checked the newspaper box. Plaintiff's Ex. 42–125 and 138.

(46) Based on the testimony elicited at trial and the exhibits introduced at trial, the Court finds Plaintiff's contention that Defendant discriminated against blacks by word-of-mouth advertising to be completely unsupported by the record in this case.

## E. *The Statistical Case.*

(47) During its case-in-chief, Plaintiff introduced the testimony of Dr. Farrell Bloch, an expert in employment discrimination statistics. Plaintiff's Ex. 126.

(48) On behalf of Plaintiff, Bloch prepared a study to determine the level of black availability for Defendant's entry level positions and to compare Defendant's hiring of blacks against the availability benchmarks. Plaintiff's Ex. 127 at 1. Bloch concluded that black availability for entry level positions at Defendant's facility was roughly 28%. Defendant's hiring of blacks during the class period was 12%. Therefore, Bloch ascertained that the standard deviation of −3.19 was highly significant. *Id.* at 12. Bloch further concluded that this deviation in the number of blacks hired by Defendant was probably a result of word-of-mouth advertising and subjective hiring criteria. *Id.*

(49) Bloch's availability study consisted of two (2) dimensions—geographic and occupational. The Court believes that the evidence at trial demonstrated that Bloch's methodology utilized in the study was significantly flawed as to both of these dimensions. Thus, the conclusion of the study is unreliable.

### 1. Geographical Dimension.

(50) In the geographic dimension of the study, Bloch examined the applications of the 561 applicants during the class period and determined from which county or city each resided. *Id.* at 4. The address of each applicant was determined from the application itself. Bloch Tr. at 476. Bloch then counted the number of applicants from Gastonia (149 or 27.85% of the total), the rest of Gaston County (219 or 40.93%), Charlotte (122 or 22.80%), the rest of Mecklenburg County (12 or 2.24%), Cleveland County (13 or 2.43%), York County (12 or 2.24%), and Cabarrus County (8 or 1.50%). Plaintiff's Ex. 127 at 5. Only 535 applications were used in the study because addresses from areas that did not total at least one percent of the total were not used. *Id.* The final black availability

benchmarks are weighted averages from the percents of each area. *Id.*

(51) Separating *Charlotte from Mecklenburg County and Gastonia from Gaston County* has the effect of increasing the availability of blacks in the overall work force. The percentage of blacks in the cities is much larger than the percent of blacks in the rest of the two (2) counties. Haworth Tr. at 602. By separating out the cities from the counties, the overall availability in the weighted averages increases dramatically. *Compare* Plaintiff's Ex. 127 at 5 *with* Defendant's Ex. 29.

(52) Defendant demonstrated at trial that Bloch's attempt to separate out the cities from the counties was methodologically flawed. Bloch relied solely on the addresses listed on the applications in deciding to count that application in the city or the rest of the county categories. Bloch Tr. at 494. He did not utilize maps of the counties, nor did he visit the addresses. *Id.*

(53) It is not possible to determine whether a person resides in the city or the county based solely on a mailing address. At trial, Defendant showed that 12 of the Charlotte addresses that Bloch categorized in the city were actually located in Mecklenburg County. *Id.* at 509–521.

(54) On redirect, Bloch attempted to deemphasize the flaw in the study by stating that it would take a shift of 25 applicants from Charlotte to the rest of Mecklenburg County to get a drop of 1% in bottom line black availability. *Id.* at 556. Because Defendant only demonstrated 12 of the addresses are in the wrong category, Plaintiff argues that the Court should disregard this flaw. Trial Tr. at 571–72.

(55) The Court finds that it is largely irrelevant that Defendant has only demonstrated that 12 addresses are in the wrong category. A showing of only 1 address in the wrong category would demonstrate Defendant's point; namely that "you can't tell by the application where that person lives unless you go to the map and identify the street and the number on the house and determine whether that person is in the city or county". Bloch Tr. at 559 and 692. A representative of the postal service, John

Geeter, confirmed this point by testifying that it "was not possible to look at an address alone, without a map, without contacting the people, without going out to see the road, and tell *ever* whether they live within the city or without the city of Charlotte. Geeter Tr. at 591 (emphasis added).

(56) Moreover, the burden of convincing the fact finder that Bloch's study is methodologically sound is on Plaintiff. Defendant did not represent that it had done an exhaustive study of all the applications. *Id.* at 693. Rather, Defendant illustrated through the use of the 12 examples that the methodology in Bloch's study is seriously flawed. Haworth Tr. at 644–645. For these reasons, the Court finds that the cities cannot be separated from the counties.

(57) The Court finds as more factually accurate the weighted averages of Defendant's expert, Charles Haworth. Defendant's Ex. 28. Those averages and the number of applicants are as follows: Gaston County (368 or 68.8%), Mecklenburg County (134 or 25.0%), Cleveland County (13 or 2.4%), York County (12 or 2.2%), and Cabarrus County (8 or 1.5%). Defendant's Ex. 29.

(58) The geographic dimension of the study is further flawed by the fact that Bloch included in the applications the tabulated non-entry level applicants. Bloch instructed his assistant to segregate blue collar applicants from white collar applicants. Bloch Tr. at 498. However, the only criteria given to define white collar applicants was managers, clericals, or financial analysts. *Id.* at 499. It is undisputed that entry level positions were narrowly defined to those listed *supra.* Finding of Fact 13. It became apparent during the cross examination of Bloch that he did not know which positions were considered entry level. *Id.* at 499–510. Bloch did not even have available to him job descriptions for entry level positions when he prepared the report of his study. *Id.* at 524.

(59) The effect of Bloch including all blue collar applicants in the geographical dimension of the study was to include highly skilled and paid technicians such as

pressmen, laser operators, and film processors in the geographic analysis. *Id.* at 507–510. Personal commuting distance, an important factor in determining which persons might be inclined to apply at Defendant's facility, is apt to increase if the pay rate is higher. *Id.* at 505. For example, a pressman making $14.00 an hour is more willing to travel further than a janitor making $5.75 an hour. *Id.*

(60) The Court believes that the inclusion of non-entry level applicants in Bloch's geographical analysis caused a wider commuting pattern to be included in the study. Thus, the study places too much emphasis on those persons that reside in Charlotte and Gastonia. It is more likely that applicants for these entry level positions resided outside the cities and closer to Defendant's facility in the rest of the two counties. Defendant's Ex. 30. Moreover, it is unlikely that applicants traveled west from Charlotte to the outer western boundary of Mecklenburg County. Defendant's Ex. 31. The commuting pattern indicates a west to east flow of commuters in a direction towards Charlotte, not away from it. *Id.*

### 2. Occupational Dimension.

(61) The occupational dimension of the study was an attempt to determine the number of blacks available in the geographical area to fill entry level positions at Defendant's facility. After examining the applications, Bloch separated out blue collar from white collar applicants. Plaintiff's Ex. 127 at 6. Bloch then placed the blue collar applicants into four occupational categories listed in the 1980 Census. *Id.* The 1980 Census lists the number of blacks that work in the geographical areas listed above and the categories selected by Bloch. Plaintiff's Ex. 127A.

(62) The Census breaks down occupations into six broad categories. Bloch determined that of the six broad categories, the category titled "freight, stock, and material handlers" was most analogous to the entry level positions at Defendant's facility. The broad category of "freight, stock, and material handlers" has two major sub-categories including those of "handlers, equipment cleaners, helpers, and laborers" and "machine operators, except precision". Bloch considered these two sub-categories in his analysis. A sub-category of the "handlers, etc." sub-group was also used by Bloch. That sub, sub-category is titled "operators, fabricators, and laborers". *Id.* at 9.

(63) An inherent problem with using Census data is that the categories do not perfectly match the positions at Defendant's facility. Bloch Tr. at 480. Some of the categories are too narrow while others are too broad. *Id.* For example, the category "freight, stock, and material handlers" would include all positions contained in the other three sub-categories. Obviously, the sub, sub-category "operators, fabricators, and laborers" would contain many fewer positions than those of the others. Bloch attempted to compensate for this problem by analyzing the data in the four different categories and comparing the results. *Id.* Bloch hypothesized that if the results were similar in each of the four categories, he could have confidence that the true representation of blacks among the people who would be interested in an entry level position at Defendant's facility would be in the ballpark of the estimates in each of the four categories. *Id.*

(64) After multiplying the Census data in four categories by the weighted averages of the geographical areas from which the applicants resided, Bloch determined that the black availability percentages were between 26.40% and 25.71%. Plaintiff's Ex. 127 at 9. Thus, Bloch estimated that the black availability percentage was approximately 26%, the mid-point of these percentages.

(65) As noted *supra*, the Court believes that Bloch's weighted averages are flawed based on separating out Charlotte and Gastonia from Mecklenburg County and Gaston County. Findings of Fact 50–56. The black availability percentages without separating the cities from the counties range from 22.72% to 23.65%, with a mid-point of approximately 23%. Defendant's Ex. 32 Thus, without even considering adjustments in the occupational dimension of the study, the standard deviation utilizing the

more accurate benchmark of 23% black availability percentage is –2.4; significantly less than the –3.19 standard deviation suggested by Plaintiff. Plaintiff's Ex. 159.

(66) Bloch further increased the black availability percentage. Bloch felt that black availability was understated in his study. Since 1980, the Census with the latest available statistics, blacks in various labor markets have tended to increase as a proportion of the work force. Moreover, Bloch stated that blacks were disproportionally undercounted in the 1980 Census. *Id.* at 8.

(67) To compensate for this perceived understatement in black availability, Bloch determined that the percent of overall available blacks should be increased by approximately 2% for a total black availability percentage of 28%. *See generally id.* at 8–11.

(68) A major flaw in the occupational dimension of the study is that Bloch assumed that the only individuals applying for positions at Defendant's facility were employed in those occupations solely within the categories used in the study. Bloch Tr. at 538. Bloch did not consider the previous experience listed on the applications. *Id.*

(69) The impact of using general occupational categories was that many persons that might be inclined to apply at Defendant's facility that were employed in occupations outside the categories used by Bloch were not considered in the study. Haworth Tr. at 606. For example, persons with sales and administrative support experience were not included in the categories utilized by Bloch. Defendant's Ex. 34(a). Both of these occupations have a low percentage of blacks employed; 5.78% in sales and 9.58% in administrative support. Defendant's Ex. 34(c).

(70) The evidence at trial, however, demonstrated that persons with this type of experience would be interested in a job at Defendant's facility. Haworth Tr. at 619. For example, one Claimant, Andria Tribble, had child care experience. Plaintiff's Ex. 40. Child care workers do not fall within any of the categories utilized in Bloch's study. Bloch Tr. at 532.

(71) The impact of excluding a wide range of occupations from the categories used in the study is obvious. People who would be a good source of candidates are eliminated by assumption. Haworth Tr. at 612–613. In connection with occupations with a low percentage of black workers such as sales and clerical positions, the overall black availability percentage is artificially increased if these professions are eliminated.

(72) Bloch also included occupations in the study that should not have been included. In three of the four categories, Bloch included garbage collectors. Defendant's Ex. 34(a). However, no position at Defendant's facility is analogous to that of garbage collector. That occupation is composed of 52.71% black workers. Defendant's Ex. 34(b). Thus, the inclusion of this occupation in the study had the effect of increasing the overall black availability percentage. Haworth Tr. at 610.

(73) The choice of which occupations to include in the categories is crucial in raising or lowering the availability of blacks in the work force. For example, by looking at all employed persons in the work force, Defendant's expert determined a black availability rate of 14.4%. Defendant's Ex. 35. By excluding managerial and professional occupations from that group, the availability of blacks rose to 16%. *Id.* By further eliminating skilled production and farming occupations, the black availability percentage was 17%. *Id.*

(74) The analysis by Defendant's expert was no more accurate than that of Plaintiff's expert. Stock brokers and computer programmers are in the occupational categories used by Haworth. Haworth Tr. at 653. Nonetheless, the testimony of Haworth was effective at demonstrating the central point of Defendant's contention; if the occupational choices are incorrect or if they have been artificially limited, a higher availability figure is produced. *Id.* at 614.

(75) The Court believes Bloch's attempt to increase the black availability percentage to reflect the proportional increase of blacks in the overall population is specula-

tive and must be rejected as factually inaccurate. Bloch failed to consider facts such as higher mortality and disability rates in blacks as well as the higher enrollment in branches of the military by blacks. Bloch Tr. at 544–546; Haworth Tr. at 622–624. Moreover, Bloch assumed without any supporting evidence that the black population was increasing in North Carolina. The preliminary 1990 Census figures show that the black population has decreased in some states such as Florida. Haworth Tr. at 656. Therefore, the Court finds that the facts do not support the decision by Bloch to raise the black availability percentage by 2%.

(76) Based on the credible testimony of Haworth, the Court finds that the occupational dimension of Bloch's study is unreliable. After compensating for the erroneous separating out of the cities from the counties in the geographical dimension of the study and erroneously raising the availability percentage by 2%, Bloch's analysis shows that the black availability percentage was approximately 23%.

The Court rejects as inconsistent with the facts ascertained at trial that the black availability percentage for entry level positions at Defendant's facility was 23%. Although Defendant did not attempt at trial to establish a particular black availability percentage, the Court believes that at a minimum Defendant has shown that the black availability percentage lies somewhere between 17 and 23 percent. With these percentages, the standard deviation falls between –1.2 and –2.4. Plaintiff's Ex. 159. In any event, the Court finds that the standard deviation was well below –3.

### F. *The Individual Claimants.*

(77) None of the seven (7) individual Claimants were hired for entry level positions at Defendant's facility. Plaintiff, in its Supplemental Proposed Findings of Fact, has attempted to compare the qualifications of the individual Claimants with persons hired six (6) months after the Claimants applied.

(78) The Court believes that it is disingenuous for Plaintiff to make such comparisons. In some situations, Plaintiff has compared a Claimant to a person that applied for a position other than that which the Claimant applied. As the Court has noted *supra,* Defendant's standard practice once the job file system was implemented was to consider applicants for only those positions they noted on their application they were interested in. Finding of Fact 25. Moreover, Plaintiff has been very selective in comparing the Claimants to applicants actually hired. In self-serving fashion, Plaintiff has completely ignored applicants hired within six (6) months of a Claimant's application if that applicant was more qualified. Therefore, the Court believes that Plaintiff's purported comparisons are unreliable and must be rejected.

(79) During trial, some Claimants suggested that they applied on occasions for which written applications were not produced. Ronald Russell, Defendant's industrial relations manager, testified that all applications submitted during the class period were kept on file. Russell Tr. at 197. Moreover, all of the applications during the class period were made available to Plaintiff. Trial Tr. at 202. Plaintiff failed to introduce any evidence at trial indicating that Defendant did not supply it with all of the applications. Therefore, the Court rejects as unreliable and in contradiction to the Best Evidence Rule testimony regarding applications of Claimants for whom there is no written application. Thus, the Court will not compare any of the Claimants for whom no written application exists.

(80) The Court further finds that Plaintiff has failed to set forth a clear procedure for comparing hirees to Claimants. Moreover, Plaintiff has completely ignored the credible testimony of Coe that individuals were in competition for positions with a pool of applicants. In most cases, Plaintiff has utterly failed to identify which persons were in the pool of candidates for the positions Claimants applied.

(81) The Court, below, will discuss each of the Claimants. However, the Court will not discuss each hiree Plaintiff has attempted to compare the Claimants to.

Rather, the Court will only compare the hirees that were clearly in the same job pool for the position for which a vacancy existed.

### 1. Claimant Andria M. Tribble.

(82) Claimant Tribble, the original charging party, applied for a position with Defendant on June 23, 1986. Plaintiff's Ex. 40. She indicated that the position applied for was "office job or whatever is available". *Id.*

(83) The position of "office job" is not an entry level position. Finding of Fact 13. Therefore, Tribble's application is outside the scope of this action.

(84) In her charge of discrimination, Tribble stated that a less qualified person, Connie (Last Name Unknown), was hired in the pressroom. Plaintiff's Ex. 1. That person was later identified as Connie Barnes who was hired as a jogger. Defendant's Supplemental Proposed Findings of Fact, filed July 5, 1991 at 19.

(85) The most recent job Tribble had prior to applying with Defendant was as a child care worker from February, 1984. Prior to that, Tribble worked for three (3) months pairing socks from June, 1983 through August, 1983. From May, 1982 through August, 1982, Tribble turned cloth. And in high school, Tribble worked weekends spinning, crealing (sic), winding, and packing cloth. Plaintiff's Ex. 40.

(86) Although Tribble initially claimed that she had extensive manufacturing experience, she ultimately admitted at trial the extent of her experience was seven (7) months of experience during two (2) summers and weekend work during high school. Tribble Tr. at 109.

(87) Barnes, on the other hand, had five (5) years of full-time, uninterrupted manufacturing experience. Defendant's Ex. 1f. Moreover, Barnes also had experience at another printing company. *Id.* Tribble acknowledged at trial that Barnes had more manufacturing experience than herself. Tribble Tr. at 110.

(88) As discussed *supra*, the Court has determined that none of Defendant's personnel were aware of Tribble's race when she applied.

(89) Plaintiff has also attempted to compare Tribble to Vickie Winchester Beam. Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 51 on page 18. Plaintiff contends that Beam had only clerical experience prior to applying with Defendant. Plaintiff's Ex. 57. Beam was hired by Defendant on August 11, 1986, some six (6) weeks after Tribble applied. *Id.* Thus, Plaintiff has failed to demonstrate that Beam was in the same applicant pool as Tribble. To the contrary, it would appear that the position for which Tribble applied was filled when Barnes was hired on July 7, 1986.

(90) In any event, Tribble has failed to demonstrate that Defendant hired a less qualified applicant for the position for which she applied. Based on these undisputed facts, the Court finds that the decision not to interview or hire Tribble was in no way related to or influenced by her race.

### 2. Claimant Jerry Burch.

(91) Claimant Jerry Burch applied for a position at Defendant's facility on April 1, 1987. Plaintiff's Ex. 34. Burch applied for a material handler position. *Id.*

(92) Burch's application indicates that he had forklift experience in the United States Army from January 15, 1981 through December 11, 1986. *Id.* The only other experience listed on the application was as a loader at American Efird Mills from June 1980 through January 1981. From the application, it was evident that Burch had been unemployed for four (4) months prior to applying at Defendant's facility.

(93) As discussed *supra*, the Court has determined that none of Defendant's personnel were aware of Burch's race when he applied.

(94) Two (2) or three (3) days after submitting his application, Burch was called for an interview. Burch Tr. at 124. After the interview, Burch did not hear again from Defendant. *Id.* at 125.

(95) At the interview, Burch discussed his military background with the plant manager. *Id.* at 134. In particular, Burch

told the plant manager that the reason he was only an E–4 after six (6) years with the Army was because he had been busted in rank on two (2) occasions—once for smoking marijuana and a second time for sleeping on duty. *Id.* at 135–136.

(96) In relation to Burch, the Court believes it unnecessary to compare him to any hiree. The Court finds that Defendant was amply justified in failing to hire Burch based solely on his poor military record. Plaintiff has introduced no evidence that persons actually hired by Defendant had such egregious prior employment records.

(97) Based on these undisputed facts, the Court finds that the decision not to hire Burch was in no way related to or influenced by his race.

3. Claimant Johnny Xavier Fewell.

(98) Claimant Johnny Fewell applied for the position of forklift operator at Defendant's facility on April 3, 1987. Plaintiff's Ex. 36.

(99) The application indicates Fewell had approximately six (6) months experience as a forklift operator at Gold Circle. The only other job experience listed on the application was at two (2) fast food restaurants. *Id.*

(100) As discussed *supra,* the Court has determined that none of Defendant's personnel were aware of Fewell's race when he applied.

(101) Persons actually hired by Defendant shortly after Fewell submitted his application had substantially more forklift experience. Samuel May had over three (3) years forklift and loading experience. Plaintiff's Ex. 47. Ryan Stroupe had over one (1) year forklift experience. Plaintiff's Ex. 121.

(102) Instead of comparing Fewell to forklift or material handler hirees, Plaintiff has attempted to compare him to Timothy McKinnish who was hired as a general bindery worker. Plaintiff's Ex. 50. The Court finds Plaintiff has failed to demonstrate that Fewell was in the same applicant pool as McKinnish. Therefore, the Court rejects this comparison as having no basis in fact.

(103) Based on these undisputed facts, the Court finds that the decision not to interview or hire Fewell was in no way related to or influenced by his race.

4. Claimant James Howard Allen.

(104) Claimant James Howard Allen testified at trial that he applied at Defendant's facility on five (5) occasions during the class period. However, only two (2) applications were introduced at trial. Allen was unsure of the dates of the other applications. Moreover, his trial testimony conflicted with his deposition testimony regarding these other applications. For these reasons, the Court believes the only credible evidence regarding Allen's applications is found in the two (2) applications introduced at trial.

(105) As discussed *supra,* the Court has determined that none of Defendant's personnel were aware of Allen's race when he applied on either occasion.

(106) Allen applied for an inspector position at Defendant's facility on March 16, 1987. Plaintiff's Ex. 32.

(107) The work record section of the application indicates Allen had experience from 1965 through 1987 with four (4) different employers inspecting machinery. *Id.*

(108) An inspector at Defendant's facility does not inspect machinery. Rather, the inspector "inspects and boxes labels". Plaintiff's Ex. 6 at 8. Of the two (2) applications submitted by Allen, neither indicates that he had any volume product inspection experience. Allen Tr. at 36. The Court finds from the face of the applications that Allen did not have the type of inspection experience that would qualify him for a position at Defendant's facility.

(109) Defendant hired three (3) persons close to the time period Allen applied for the position of inspector. Donna Aldridge had six (6) years experience inspecting socks for defects. Plaintiff's Ex. 66. Wanda Byers had over two (2) years experience inspecting hose for defects. Plaintiff's Ex. 73. Karen Moore had almost seven (7) years inspecting products at Burlington Industries. Plaintiff's Ex. 105.

(110) The type of experience gained from inspecting products in textile mills is commensurate with inspecting business forms at Defendant's facility. Allen Tr. at 36. Accordingly, the Court finds that the persons hired by Defendant for the position of inspector in March or April, 1987 had more experience and were better qualified than Allen.

(111) On October 20, 1987, Allen applied for a position in Defendant's bindery department. Plaintiff's Ex. 32A. The application indicated that Allen was last employed in October, 1986 at IBM.

(112) At trial, Allen admitted that he had been employed by American Truetzschler just prior to submitting his second application at Defendant's facility. Allen was less than forthright in admitting that he had been discharged from American Truetzschler for unsatisfactory performance. Allen Tr. at 33–35. Allen was in fact involuntarily discharged by American Truetzschler on August 3, 1987. Wright Tr. at 583; Defendant's Ex. 53–54.

(113) Although Coe was not aware of the falsities contained in Allen's application when it was reviewed, the Court believes that the false information contained in the application and the evasive manner in which Allen testified places a cloud of doubt on the credibility of Allen as a witness. The Court therefore finds Allen was not a credible witness.

(114) Plaintiff has failed to demonstrate a bindery position was available when Allen applied in October, 1987. Instead, Plaintiff has attempted to compare Allen to Donna Randolph who was hired as a laser helper and Reesa Smith who was hired as a warehouse helper. Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 67 on page 25. The Court finds these comparisons to have no basis in fact. Plaintiff has failed to demonstrate that Allen was in the same pool of applicants as Randolph and Smith.

(115) Based on these undisputed facts, the Court finds that the decision not to interview or hire Allen was in no way related to or influenced by his race.

5. Claimant Troy Darby.

(116) Claimant Troy Darby applied for a janitor position at Defendant's facility on September 12, 1988. Plaintiff's Ex. 35.

(117) Although Darby listed three (3) previous employers on the work experience section of the application, he stated on the application that he had been fired as the reason for wanting to change positions. *Id.* At trial, Darby admitted to having been fired from another position as well. Darby Tr. at 151.

(118) As discussed *supra*, the Court has determined that none of Defendant's personnel were aware of Darby's race when he applied.

(119) Plaintiff has attempted to compare Darby to James Martin who was hired as a baler operator. Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 93 on page 33. The Court finds that Plaintiff has failed to establish that Darby was in the same applicant pool as Martin.

(120) The Court believes that it is unnecessary to compare Darby to hirees. The Court finds that Defendant was amply justified in rejecting Darby's application based solely on the fact that he had been fired from a previous position. Plaintiff failed to introduce any evidence to counter Defendant's contention that it would have a negative impact on an applicant's chance of being hired if he had been fired by his most recent employer. Coe Tr. at 299.

(121) Based on these undisputed facts, the Court finds that the decision not to interview or hire Allen was in no way related to or influenced by his race.

6. Claimant Patricia Gillespie.

(122) At trial, Gillespie testified that she applied at Defendant's facility on three (3) occasions. Gillespie Tr. at 158.

(123) As discussed *supra*, the Court has determined that none of Defendant's personnel were aware of Gillespie's race when she applied.

(124) The first occasion Gillespie allegedly applied for a position at Defendant's facility was in 1985 which is outside the applicable class period. *Id.* Therefore, the

Court finds that no evidence of this application is relevant to this action.

(125) The second application was submitted by Gillespie sometime in early 1986. *Id.* at 160. However, Gillespie was not sure of the exact date. On direct, she stated that the second application was submitted "sometime in '86. February of '86". *Id.* On cross examination, Gillespie stated the application could have been submitted somewhere in the late winter, early spring of 1986. *Id.* at 168. Moreover, on her application of October 27, 1987, Gillespie stated that she had never applied to or been employed by Defendant. Plaintiff's Ex. 37.

Based on this contradictory evidence, the Court finds that Plaintiff has failed to establish that Gillespie submitted her second application after February 18, 1986—the beginning date for the class period. Therefore, the Court finds that no evidence of this application is relevant to this action.

(126) The only written application introduced at trial was submitted by Gillespie on October 27, 1987. *Id.* Gillespie indicated on the application that the position sought was "Open (clerk)". *Id.*

(127) The position of Clerk was considered clerical by Defendant. Clerical positions are not entry level positions. Finding of Fact 13. Therefore, the application is for a non-entry level position, and is outside the scope of this action.

(128) Even if the application was within the scope of this action, the Court finds that Gillespie was not an impressive candidate for a position. On the previous experience section of the application, the only previous job experience listed is a spinner position at J.P. Stevens. *Id.* Under employment dates, the only date listed is "3-3-85". The application does not indicate that Gillespie was currently employed by J.P. Stevens when she submitted the application. *Id.*

(129) By looking only at the application, Coe could only ascertain that Gillespie's only previous work experience was at most two (2) years as a spinner. Gillespie Tr. at 172.

(130) Gillespie at trial contended that she submitted a résumé with the application listing her other experience. *Id.* at 162. However, Plaintiff failed to introduce the résumé or to retrieve it from Defendant. *Id.* at 171. Hence, the Court finds that the résumé was not a part of this record and that any testimony of its existence is unreliable and must be disregarded.

(131) The Court finds that Defendant was justified in rejecting the application of Gillespie based on a sparse previous work record.

(132) Plaintiff has attempted to compare Gillespie to Reesa Smith who was hired as a warehouse helper. Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 103 on page 36. The Court finds that Plaintiff has failed to demonstrate that Gillespie was in the same applicant pool as Smith.

(133) Based on these undisputed facts, the Court finds that the decision not to interview or hire Gillespie was in no way related to or influenced by her race.

7. Claimant Janet Lynn McCorkle.

(134) Claimant Janet Lynn McCorkle was unavailable to testify at trial due to her being hospitalized. Therefore, the Court admitted the transcript of her deposition testimony in lieu of live trial testimony. Trial Tr. at 669; Defendant's Ex. 13(a).

(135) McCorkle applied only once at Defendant's facility. McCorkle Deposition (hereinafter "Dep.") at 5. No written application was introduced for McCorkle.

(136) McCorkle was unclear as to exactly when she applied, but originally thought it was sometime in the late '80's. *Id.* Later, McCorkle narrowed the application date to sometime in 1986. *Id.* at 6. McCorkle also testified that she applied at Defendant's facility in August, 1986. *Id.* at 21; Defendant's Ex. 13(b). However, she later stated that she did not remember when the date was that she applied. McCorkle Dep. at 24. Moreover, McCorkle did not remember many of the responses she provided on the application form. *Id.* at 24–26. McCorkle also stated in an attested EEOC affidavit that she applied at Defendant's facility in

November, 1986. *Id.* at 38; Defendant's Ex. 13(c).

(137) Based on the contradictory testimony of McCorkle, the Court finds that Plaintiff has failed to establish that McCorkle applied for an entry level position at Defendant's facility during the class period. The date of when McCorkle applied, if ever, has not been sufficiently established to place any application within the class period.

(138) Even if McCorkle did apply at Defendant's facility during the class period, as discussed *supra*, the Court has determined that none of Defendant's personnel were aware of her race when she applied. Moreover, Plaintiff has failed to establish for which applicant pool McCorkle was located.

(139) Based on these undisputed facts, the Court finds that the decision not to interview or hire McCorkle was in no way related to or influenced by her race.

G. *Conclusion.*

(140) The Court finds that none of Defendant's employment practices were discriminatory in practice or design.

(141) The Court finds that it was not the intention or practice of Defendant to engage in hiring practices that discriminated against persons based on their race.

(142) The Court finds that none of the Claimants were subjected to discriminatory hiring practices by Defendant.

II. CONCLUSIONS OF LAW.

(1) Any finding of fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

(2) Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1) provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's

race, color, religion, sex, or national origin ...

Accordingly, discrimination based on a persons' race or color is prohibited by Title VII.

██ (3) Title VII does not provide that a person may not be discharged *if* he is black. Rather, the law requires a Title VII plaintiff to prove by a preponderance of the evidence that he was discriminated against *because* he is black. *See Gairola v. Commonwealth of Virginia Department of General Services,* 753 F.2d 1281, 1287 (4th Cir.1985). Title VII does not require an employer to adopt a life of economic altruism and thereby require the hiring of unqualified persons. *Id.* "These antidiscrimination remedies merely preclude an employer from treating some (persons) less favorably than others 'because of' their race or some other similarly impermissible characteristic". *Id.*

(4) The language of Title VII indicates that Congress intended to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens". *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). It is clear from the legislative history of Title VII that Congress did not intend to guarantee a job to every person regardless of qualifications. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). Congress intentionally eliminated from the final draft of Title VII language that would have permitted discharge of protected groups only "for cause". *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1784–85 & note 4, 104 L.Ed.2d 268 (1989). Thus, Congress intended to maintain an employer's freedom of choice in making employment decisions based on the individual characteristics and qualities of employees. *Id.*

(5) Plaintiff contends that discrimination occurred in this case based on three (3) separate and distinct theories. First, Plaintiff contends that the evidence at trial sup-

ports a finding of disparate impact discrimination. Second, Plaintiff contends that the evidence at trial supports a finding of disparate treatment discrimination as to each individual class member. Third, Plaintiff contends that the evidence at trial supports a finding of disparate treatment as to the class as a whole; in other words "pattern and practice" discrimination.

The Court will address each theory below.

### A. *The Disparate Impact Case.*

■ (6) Title VII prohibits not only overt forms of discrimination, but also practices that are fair in form but discriminatory in practice. *See Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989). Under this theory, which is known as disparate impact discrimination, "a facially neutral employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate". *Id.*

■ (7) In order to prevail in a disparate impact case, the plaintiff must show that a facially neutral standard for hiring excludes a disproportionate number of members of a protected class. *See EEOC v. Sears, Roebuck & Co.,* 628 F.Supp. 1264, 1281 (N.D.Ill.1986) (citing *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) (Rehnquist, J., concurring)), *aff'd,* 839 F.2d 302 (7th Cir. 1988). The burden of proof then shifts to the defendant to show that the job requirement has a manifest relationship to the job in question. *Id.* If the employer demonstrates that the challenged requirements are job related, the plaintiff may then show that other selection devices would also serve the employer's legitimate interest in efficient and trustworthy workmanship. *Id.*

■ (8) Disparate impact cases are typically based on an employment practice that utilizes an objective standard applied evenly and automatically to affected employees or applicants. *See Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 274 n. 10 (4th Cir.1980). Examples of such objective

practices include an intelligence or aptitude test, or height and weight requirements. *Id., see also Pope v. City of Hickory, N.C.,* 679 F.2d 20, 22 (4th Cir.1982). Where the plaintiff does not complain of some employment practice or procedure which, though neutral or fair on its face, has a discriminatory impact based on race, the claim cannot be characterized as one based on discriminatory impact. *See Pope,* 679 F.2d at 22.

■ (9) The Fourth Circuit has found where a plaintiff fails to produce evidence of an objective standard such as a physical requirement with respect to height or a high school diploma or a minimum passing score on an aptitude test, the claim should be treated as a disparate treatment case and not a disparate impact case. *See EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 639 (4th Cir.1983), *rev'd on other grounds sub nom., Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Various other courts have made similar findings. *See Coates v. Johnson & Johnson,* 756 F.2d 524 (7th Cir.1985); *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475 (9th Cir.1983); *Pope,* 679 F.2d at 22; *Stastny,* 628 F.2d at 274, n. 10; *Sears, Roebuck & Co.,* 628 F.Supp. at 1281; *EEOC v. International Business Machines Corp.,* 583 F.Supp. 875, 901 (D.Md. 1984).

■ (10) Plaintiff has suggested only two (2) employment practices by Defendant that it claims adversely impacted on blacks in Defendant's hiring decisions. "The screening of blacks during the selection process and the lack of hiring of blacks has been the result of word-of-mouth recruitment and subjective hiring criteria implemented by all whites involved in the recruitment, screening and selection of employees at Jordan Graphics." *See* Plaintiff's Supplemental Proposed Findings of Fact, filed July 5, 1991 at par. 41 on page 15.

(11) The Court does not believe either of these practices are objective in nature. Therefore, this case is not properly characterized as a disparate impact case. *See*

*Federal Reserve Bank of Richmond,* 698 F.2d at 639.

(12) One court has refused to consider the use of subjective hiring criteria and the failure to post job openings (a type of word-of-mouth advertising) as evidence of disparate impact discrimination. *See Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795, 799 (5th Cir.1982).

(13) As discussed *supra,* the Court has found no basis in fact to support Plaintiff's claim that Defendant engaged in word-of-mouth advertising or utilized discriminatory subjective hiring criteria. Findings of Fact 35–46. Therefore, even if the claim could be characterized as disparate impact discrimination, the claim has no basis in fact.

(14) Based on the foregoing, the Court concludes that Plaintiff's claim of disparate impact discrimination is not well-founded in fact or law.

B. *The Individual Disparate Treatment Case.*

■ (15) In a case where a plaintiff alleges that he was subjected to discriminatory disparate treatment, the plaintiff must prove intentional discrimination. *See Kelso v. Homelite,* 661 F.Supp. 477, 482 (W.D.N.C.1987). The employer's intent or motivation may be shown by inferences rather than direct evidence of intentional discrimination, but the evidence, whether direct, circumstantial, or otherwise must establish by a preponderance of the evidence the discriminatory intent and not simply that the employee was a member of a protected class. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

(16) The United States Supreme Court has set forth the burdens and order of proof for a disparate treatment case. *See Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–26. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima fa-cie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94.

■ (17) The standard enunciated in *Burdine* is not to be applied in a ritualistic manner. *See EEOC v. Andersons' Restaurant of Charlotte,* 666 F.Supp. 821, 842–43 (W.D.N.C.1987), *aff'd in part and rev'd in part on other grounds,* 872 F.2d 417 (4th Cir.1989). Generally, the claimant's burden is to establish that he or she applied for an available position, for which he or she was better qualified than the successful candidate. *Id.*

(18) The Court will discuss each of the three (3) burdens and orders of proof for a disparate treatment case below.

1. The prima facie showing.

(19) The burden of establishing a prima facie case of disparate treatment is not onerous. *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94. The purpose of requiring a plaintiff to make a prima facie showing is to eliminate the most common nondiscriminatory reasons for the plaintiff's rejection. *Id.* at 254, 101 S.Ct. at 1094.

■ (20) The standard for establishing a prima facie case is flexible. *See id.* at 254, note 7, 101 S.Ct. at 1094, note 7. The Fourth Circuit has enunciated the following test which requires the plaintiff to demonstrate that:

(1) He belonged to a racial minority;

(2) He applied and was qualified for the position which the employer was seeking applicants;

(3) Despite his qualifications, the plaintiff was rejected; and

(4) After the plaintiff's rejection, the position remained open and the employer continued to seek applicants.

*See Monroe v. Burlington Industries, Inc.,* 784 F.2d 568, 571 (4th Cir.1986); *see also Andersons's Restaurant of Charlotte,* 666 F.Supp. at 842–43; *accord McNairn v. Sullivan,* 929 F.2d 974, 979 (4th Cir.1991); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989). On other occasions, the Fourth Circuit has found that in order to establish a prima facie case of disparate treatment discrimination, "the plaintiff must prove by a preponderance of the evidence that she applied for the available position, for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination". *See Anderson v. City of Bessemer City, N.C.,* 717 F.2d 149, 153 (4th Cir.1983) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093), *rev'd on other grounds,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Andersons' Restaurant of Charlotte,* 666 F.Supp. at 843.

 (21) The Court believes that Plaintiff has failed to establish a prima facie case as to four (4) of the Claimants.

(a) As to Claimant Darby, Plaintiff failed to demonstrate that any position for which he applied (janitor) was available. Finding of Fact 119. In fact, Plaintiff attempted to compare Darby to James Martin who was hired as a baler operator. Finding of Fact 119. Moreover, the Court has found that Darby, because of being previously fired from other jobs, was not qualified for the position.

(b) As to Claimant Burch, the Court found that his poor military record made him an unacceptable candidate for a position at Defendant's facility. Finding of Fact 96. Therefore, Burch was not qualified for a position.

(c) As to Claimant Gillespie, the Court found that she failed to apply for an entry level position. Finding of Fact 127. Moreover, the Court found that Gillespie was not qualified for a position at Defendant's facility based on her sparse work record. Finding of Fact 131.

(d) As to Claimant McCorkle, the Court found that Plaintiff failed to establish that she applied for an entry level position dur-

ing the applicable class period. Finding of Fact 137. Moreover, the Court found that Plaintiff failed to compare McCorkle to any hirees in an applicant pool, thus casting further doubt on whether she applied for a vacant entry level position. Finding of Fact 138.

(22) The Fourth Circuit has held that an employer has the right to fix the qualifications that are necessary or preferred in hiring an employee, and in order to make out a prima facie case, a plaintiff must establish that she meets these qualifications. *See Federal Reserve Bank of Richmond,* 698 F.2d at 671. Accordingly, the Court believes as to these four (4) Claimants, Plaintiff has failed to make a prima facie showing.

2. The showing of a nondiscriminatory reason for rejection.

 (23) In regards to the remaining three (3) Claimants and to the other Claimants regardless if a prima facie showing has been made by Plaintiff, the burden the defendant carries once the plaintiff has made a prima facie showing is only an intermediate burden to produce evidence of a nondiscriminatory reason for the action. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The burden of proof never shifts to the defendant. The ultimate burden of persuading the fact finder that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See id.* at 253, 101 S.Ct. at 1093.

(24) It is not sufficient for the Claimants to show that they were just as qualified as the hirees. The burden on the Claimants is to establish that they were *better* qualified than the successful applicants. *See Anderson,* 717 F.2d at 153; *Federal Reserve Bank of Richmond,* 698 F.2d at 672.

(25) Defendant has contended that other more qualified applicants were hired instead of the Claimants. The Court believes that the evidence produced at trial supports this position.

(a) As to Claimant Tribble, the Court has found that she had limited manufacturing experience. Finding of Fact 86. The person actually hired by Defendant had sub-

stantially more manufacturing experience than Tribble. Finding of Fact 87. Moreover, Plaintiff failed to demonstrate that Tribble was in the same applicant pool as Vickie Beam—a hiree that Plaintiff attempted to compare Tribble to. Finding of Fact 89. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(b) As to Claimant Burch, the Court has found that he was not qualified for the position due to a poor military record. Finding of Fact 96. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(c) As to Claimant Fewell, the Court has found that persons hired for the position for which he applied had substantially more forklift experience than he. Finding of Fact 101. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(d) As to Claimant Allen, the Court has found that other persons hired by Defendant had more production type inspection experience than Allen, whose inspection experience was limited to the inspection of machinery. Findings of Fact 107, 109, and 110. The Court further found that Plaintiff failed to demonstrate that Allen was in the same applicant pool as Donna Randolph—a hiree that Plaintiff attempted to compare Allen to in relation to the bindery position for which Allen applied. Finding of Fact 114. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(e) As to Claimant Darby, the Court has found that Darby was not qualified for a position at Defendant's facility. Finding of Fact 120. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(f) As to Claimant Gillespie, the Court has found that she was not qualified for a position at Defendant's facility based on her sparse work record. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(g) As to Claimant McCorkle, the Court has found that Plaintiff has failed to establish that she applied for an entry level position or that she was in an applicant pool for a particular position. Therefore, Defendant has articulated a legitimate, nondiscriminatory reason for its rejection of this Claimant.

(26) The Court concludes that Defendant was justified in hiring other persons with equal or better qualifications than the Claimants for vacant positions at Defendant's facility.

3. The pretextual showing.

(27) Plaintiff has attempted to convince the Court that the reasons put forth in support of Defendant's rejection of the Claimants are pretextual. However, the Court has found that none of these reasons have a basis in fact.

(a) Plaintiff contended at trial that Defendant engaged in an illegal employment practice by refusing to hire black applicants with applications 30 days or more old. Trial Tr. at 719–720; Plaintiff's Ex. 158. However, the Court found that the evidence at trial indicated that the 30 day period only restricted an applicant from submitting a second application and did not restrict Coe from considering applications more than 30 days old. Finding of Fact 22.

(b) Plaintiff contended at trial that Defendant hired white applicants for positions other than for what they applied while refusing to do the same for black applicants. The Court found that this contention had no basis in fact. Finding of Fact 24.

(c) Plaintiff contended at trial that entry level positions required no skills and that Defendant only rejected non-skilled black applicants. The Court found that while the entry level positions required no particular skills, Coe kept certain qualities in mind when he evaluated the applications. Finding of Fact 28. The Court further found that after October, 1986 the applications were maintained in job files, and the applicants were compared to those persons in the job file. Finding of Fact 29.

(28) Even if Defendant and the Court were mistaken regarding whether

the hirees had qualities more desirable than the Claimants, this fact alone would be of no import. This Court has stated on a previous occasion that:

> The Plaintiff cannot prove that the employer's reason for his discharge was pretextual merely by claiming that the employer's action was mistaken. The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all, as long as the decision was not based on race and/or sex or other unlawful discriminatory criteria. An employer is not required to prove that its decision was correct; the trier of fact need only determine that the defendant, in good faith believed the plaintiff's performance to be unsatisfactory and that the asserted reason for the action was not a mere pretext for discrimination.

*Grier v. Casey,* 643 F.Supp. 298, 308–09 (W.D.N.C.1986) (citations omitted). In this case, the Court believes that Plaintiff has failed to demonstrate that Defendant lacked good faith in failing to hire the Claimants. Therefore, it cannot be said that Defendant's reason for not hiring the Claimants was pretextual.

(29) Based on the foregoing, the Court concludes that Defendant did not engage in disparate treatment discrimination of the individual Claimants.

## C. *Disparate Treatment of the Class— the Pattern and Practice Case.*

(30) A plaintiff in a Title VII action that alleges disparate treatment of a class must establish that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice". *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (citing *Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). Proving isolated or sporadic discriminatory acts by the employer is not sufficient to establish a prima facie case of a pattern and practice of discrimination. *Id.* 467 U.S. at 875, 104 S.Ct. at 2799.

(31) The plaintiff in a pattern and practice case carries a much higher burden than in a disparate treatment case for an individual Claimant. The pattern and practice must be one based upon a specific intent to discriminate against an entire group. *See Stastny,* 628 F.2d at 274, n. 10. The greater intrinsic difficulty in establishing the existence and common reach of such a subjectively based practice is obvious. *Id.* Thus, there is a wide gap between an individual that demonstrates that he has been subjected to disparate treatment discrimination and the existence of a class of persons who have suffered the same injury as the individual. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 157–58, 102 S.Ct. 2364, 2370–71, 72 L.Ed.2d 740 (1982). The existence of a valid individual claim does not necessarily warrant the conclusion that the individual Plaintiff may successfully maintain a class action. *See Cooper,* 467 U.S. at 877, 104 S.Ct. at 2800. A class Plaintiff's attempt to prove the existence of a company-wide discriminatory practice may fail even though discrimination against one (1) or two (2) individuals has been proved. *Id.* at 878, 104 S.Ct. at 2800.

(32) At trial, Defendant argued that Plaintiff's pattern and practice case must fail because the anecdotal testimony of seven (7) Claimants is insufficient to establish that Defendant's standard operating procedure was to engage in the acts Plaintiff contends are discriminatory. The Court believes that Defendant's argument is somewhat compelling. In *Federal Reserve Bank of Richmond,* the Fourth Circuit found that the testimony of two Claimants was insufficient to establish a pattern and practice case. *Federal Reserve Bank of Richmond,* 698 F.2d at 643. The Fourth Circuit noted that the case before it presented quite a contrast with *Teamsters* where 40 cases of specific instances of discrimination were presented. Moreover, the court also cited to *Chisholm v. United States Postal Service,* 665 F.2d 482, 495 (4th Cir.1981) where 20 class members testified of individual discrimination. *Id.*

This Court is unaware of case law providing clear direction as to the number of Claimants necessary to support a claim of pattern and practice discrimination. The Court is aware of its own decision in *Andersons' Restaurant of Charlotte* in which the Court found that the testimony of six (6) Claimants was sufficient to support a pattern and practice case. *See Andersons' Restaurant of Charlotte*, 666 F.Supp. at 842. In that case, however, *no* blacks were hired during the applicable class period. Moreover, direct evidence of discrimination was presented to bolster the plaintiff's claim of pattern and practice discrimination. In the case currently before the Court, Defendant hired a number of blacks during the class period and absolutely no direct evidence of discrimination was presented at trial. Thus, the Court views this case significantly different than *Andersons' Restaurant.*

Although the Court does not rule today on the issue of whether the anecdotal testimony of only seven (7) Claimants is sufficient to establish a pattern and practice case, the Court seriously doubts the sufficiency of so few Claimants to establish a pattern and practice case.

(33) Plaintiff claims that subjective hiring practice of Defendant and word-of-mouth advertising coupled with statistical evidence is proof of Defendant's pattern and practice of discrimination. Plaintiff's Trial Brief, filed May 7, 1991 at 13.

(34) Properly authenticated statistics constitute an accepted form of circumstantial evidence of discrimination and may be sometimes sufficient to establish without more a prima facie case of discrimination. *See Federal Reserve Bank of Richmond*, 698 F.2d at 645. Once a prima facie case in a pattern and practice case has been established, the burden shifts to the employer to produce evidence that the plaintiff's statistics (or other proof) is either inaccurate or insignificant. *See Teamsters*, 431 U.S. at 360, 97 S.Ct. at 1867.

(35) The Court believes that Plaintiff has failed to establish a prima facie showing of discrimination through the use of its statistics. The Fourth Circuit has warned that statistics come in infinite variety and their usefulness or weight depends on all of the surrounding facts and circumstances. *See Federal Reserve Bank of Richmond*, 698 F.2d at 645. Inaccuracies in methodology can lead to different, contradictory, or even misleading conclusions. *Id.* The manipulability of statistical models is evident—"Statistics can be exaggerated, oversimplified, or distorted to create support for a position that is not otherwise supported by the evidence". *Id.* at 645, n. 9 (quoting Note, *Judicial Refinement of Statistical Evidence in Title VII Cases*, 13 Conn.L.Rev. 515, 525–26 (1981)). Statistical evidence must not be accepted uncritically. *Id.* at 646. Courts must guard against the use of statistical data which may have been fashioned to obtain a desired result. *Id.* In no case, should there be a blind adherence to the proposition that mere statistical imbalance equals discrimination. *Id.*

It has been said, statistics are like a lamp post to a drunk—they provide support but furnish very little illumination.

(36) Plaintiff has argued that its statistical evidence demonstrates a standard deviation of –3.19 in the number of blacks hired at Defendant's facility versus the number of available blacks. Finding of Fact 48. However, the Court concluded that Bloch's study was methodologically flawed and that the standard deviation most likely fell between –1.2 and –2.4. Finding of Fact 76.

(37) The Fourth Circuit has cautioned against attaching significance to standard deviations between one and three. *See Allen v. Prince George's County, Md.*, 737 F.2d 1299, 1307 (4th Cir.1984); *Federal Reserve Bank of Richmond*, 698 F.2d at 648; *EEOC v. American National Bank*, 652 F.2d 1176, 1192 (4th Cir.1981), *cert. denied*, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). Even if the Court accepted the higher standard deviation of –2.4, the Court does not believe that Plaintiff has demonstrated that any of Defendant's employment practices resulted in this standard deviation. Moreover, a standard deviation of –2.4 is toward the lower side of the minimal amount that the Fourth Circuit

has found to be statistically significant. In *Federal Reserve Bank of Richmond*, 698 F.2d at 651, the Fourth Circuit found a standard deviation of marginally over the level of –2.0 to be insignificant. Accordingly, the Court concludes that Plaintiff has failed to establish a prima facie case of pattern and practice discrimination.

(38) Even if the Court accepted Plaintiff's proposal that the standard deviation in this case was –3.19, the Court would conclude that the statistical showing was insufficient to establish a prima facie showing. In *Allen*, 737 F.2d at 1307, the Fourth Circuit upheld the district court's conclusion that a standard deviation less than one full standard deviation over the threshold of three (3) set by *Federal Reserve Bank of Richmond* was insignificant. The court noted that a standard deviation marginally over the level of three (3) was far less than the double-digit figure found significant in the seminal case for the use of statistics in Title VII cases, *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). *Id.; c.f., Lewis v. Bloomsburg Mills, Inc.*, 773 F.2d 561, 568–69 (4th Cir. 1985) (standard deviation of –5 to –8 was significant).

▄ (39) Finally, the Court believes that the recent Supreme Court case of *Wards Cove* bars a finding of significance in this case. Although the *Wards Cove* case was a disparate impact case, the Court believes the holding is equally applicable to a pattern and practice case. In that case, the Court of Appeals relied solely on the plaintiffs' statistics in finding that a prima facie showing had been made. *See Wards Cove*, 109 S.Ct. at 2121. Justice White, in writing for the majority, held that the finding constituted reversible error. *Id.* The court noted that a Title VII plaintiff does not make out a case of discrimination by showing that at the bottom line there is a racial imbalance in the work force. *Id.* at 2124. Rather, the plaintiff must demonstrate that it is the application of *a specific or particular employment practice* that has created the discrimination under attack. *Id.* The Court stated that the use of statistics alone would have the practical effect of requiring many employers to adopt racial quotas, insuring that no portion of its work force deviates in racial composition from the other portions thereof. *Id.* at 2122. Such an effect is a result that Congress expressly rejected in drafting Title VII. *Id.*

(40) As previously noted, Plaintiff has only identified two (2) employment practices that it believes lead to the pattern and practice of discrimination—the use of subjective hiring criteria and the use of word-of-mouth advertising. Plaintiff's Trial Brief, filed May 7, 1991 at 13. However, the Court has rejected both of these contentions as being inconsistent with the facts established at trial. Findings of Fact 35–46. Therefore, the only possible argument left in support of Plaintiff's pattern and practice case is bare statistical evidence. The Court believes that even if Plaintiff was correct in arguing that a standard deviation of –3.19 is present in this case, *Wards Cove* would require the Court to find no prima facie case of discrimination has been proven. After *Wards Cove*, a statistical showing alone is meaningless without a specific, identifiable employment practice that is discriminatory.

(41) Based on the foregoing, the Court concludes that Plaintiff has failed to establish a prima facie showing that Defendant engaged in a pattern and practice of disparate treatment discrimination against the class of Claimants.

## III. AWARD TO DEFENDANT OF ITS COSTS AND REASONABLE ATTORNEY'S FEES.

(1) Defendant has requested in its answer that it be awarded costs and reasonable attorney's fees.

(2) Title 42, United States Code section 2000e–5(k) provides that a prevailing party in a Title VII action can recover its costs and reasonable attorney's fees. That statute provides:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as

part of the costs, and the Commission and the United States shall be liable for costs the same as a private party.

■ (3) A prevailing defendant in a Title VII action is entitled to its reasonable attorney's fees if the suit was brought in bad faith, or if the action is brought in good faith, the action is nonetheless frivolous, unreasonable, or without foundation. *See Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 109 S.Ct. 2732, 2735–36, 105 L.Ed.2d 639 (1989); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418–21, 98 S.Ct. 694, 698–700, 54 L.Ed.2d 648 (1978); *Glymph v. Spartanburg General Hospital*, 783 F.2d 476, 479 (4th Cir.1986).

(4) A finding that an action is frivolous, unreasonable, or without foundation cannot result solely because the plaintiff did not prevail on the action. *See Glymph*, 783 F.2d at 479. Since the results of many lawsuits are not predictable, plaintiffs are not to be discouraged from bringing an action just because it is less than airtight. *Id.*

(5) In *Glymph*, the district court found a lawsuit was frivolous and awarded to the prevailing defendant attorney's fees. However, the court had denied the defendant's motion for summary judgment and for a directed verdict. Moreover, the district court delayed for some time in issuing its opinion. *Id.* The Fourth Circuit found that the district court abused its discretion in awarding fees. *Id.* at 480. In particular, the court found that the actions of the district court tended to show that at the time of ruling on the motions for summary judgment and directed verdict the district court did not believe the action was frivolous. *Id.*

(6) The Fourth Circuit in *Glymph* did not formulate a per se rule that the denial of motions for summary judgment and for a directed verdict necessarily precludes a later finding of frivolity. Nonetheless, the court noted that it found such actions to be indications that the district court had found the plaintiff at a minimum had made out a prima facie case. *Id.*

■ (7) Later Fourth Circuit cases have held that the decision to deny a defendant's motion to dismiss the complaint does not necessarily preclude a later finding of frivolity. *See Introcaso v. Cunningham*, 857 F.2d 965, 967 (4th Cir.1988). In some instances, "it may be necessary for defendants to 'blow away the smoke screens the plaintiffs had thrown up' before the defendants may prevail". *Id.* (quoting *Hicks v. Southern Maryland Health Systems Agency*, 805 F.2d 1165, 1167–68 (4th Cir. 1986)). For example, the plaintiff may be able to establish a prima facie case that is weak but which is sufficient to survive a motion for a directed verdict. *Id.* at 967–68. However, if it should have been apparent to the plaintiff that a defense would make his claims groundless, the district court is justified in awarding attorney's fees in such a situation. *Id.* at 968; *see also Blue v. United States Department of Army*, 914 F.2d 525, 536–37 (4th Cir.1991) (plaintiffs are "not free, simply because they can meet the requirements of a prima facie case (and thus survive a motion for a directed verdict), to disregard evidence that comes to light in discovery and to continue to press their case without any reasonable belief that Plaintiffs actually were the victims of racial discrimination").

■ (8) In this case, the Court believes that Plaintiff's action is frivolous, unreasonable, and without foundation. Moreover, the Court believes that Plaintiff should have been aware of the frivolous nature of the action shortly after the discovery period had ended. The crux of Plaintiff's case rests on the contention that Defendant engaged in word-of-mouth advertising in filling vacant entry level positions. However, during the discovery process, Plaintiff should have discovered that most of the hirees that indicated that they were referred by a friend or relative did not indicate on the application who that friend or relative was. Finding of Fact 40. Thus, Defendant's personnel department was unaware of the race of the person referring those applicants. *Id.* Furthermore, Plaintiff should have been aware that Defendant advertised 85 to 90% of its

vacant positions in newspapers. Finding of Fact 44.

 (9) For these reasons, the Court believes that Plaintiff should have been aware after the close of discovery that Defendant had not engaged in word-of-mouth advertising or discriminatory subjective hiring criteria. Thus, Plaintiff should have also been aware that no specific employment practice of Defendant could be identified as being discriminatory. Accordingly, the Court believes that Plaintiff should be required to pay Defendant's costs and reasonable attorney's fees incurred after the close of discovery in this case. Defendant is directed to submit affidavits and records attesting to the reasonableness of its costs and attorney's fees no later than 14 days from this Order being filed. Plaintiff, if it chooses, is granted 14 days from the date Defendant submits its affidavits and records to respond. The Court will be reluctant to extend these deadlines.

## IV. ORDER OF THE COURT.

NOW, THEREFORE, IT IS ORDERED that:

(1) Plaintiff's claims of discrimination are DISMISSED WITH PREJUDICE;

(2) Judgment will be entered simultaneously with this Order;

(3) Defendant's motion for a directed verdict is DENIED AS MOOT; and

(4) Defendant is awarded the costs and reasonable attorney's fees incurred by it from the close of discovery, as approved by this Court.